**Schanbacker Estate**

*Grim & Grim*, for executor.

*Catherine R. Barone*, for Commonwealth.

SATTERTHWAITE, P. J., August 29, 1972.—The first and final account of Bucks County Bank and Trust Company, executor of the estate of said decedent, was presented to the court for audit, confirmation and distribution of ascertained balances on June 5, 1972, as advertised according to law. Due proof of appropriate notice thereof to all parties legally interested in said estate appears in the record.

Said account has been examined and audited by the court. Balances for distribution shown thereby include principal in the amount of $45,172.83, composed of bank stock at $15,872, preaudit distributions at $1,461, and cash of $27,839.83; and income in the amount of $1,492.60 in cash. Said respective balances for distribution appear to have been correctly computed and stated on the accounting filed.

Accountant submitted to be debited to income with $247.57 for additional interest received since the closing date of the accounting. Accountant requested and is hereby allowed additional credit against income in the amount of $27.08 for income taxes (United States and Pennsylvania) and income commissions paid since the closing date of the accounting. The income balance for distribution shown in the account is hereby increased accordingly.

The only question for adjudication is an inheritance tax problem submitted to the court for determination at audit pursuant to notice by accountant to that effect under section 1001(2) of the Inheritance and Estate Tax Act of June 15, 1961, P.L. 373, 72 PS §2485-1001(2). The Commonwealth has included in the inheritance tax appraisal the value of certain intervivos gifts by decedent, contending that they were transfers presumptively taxable as made in contemplation of death under section 222 of that statute. Accountant counters that the facts and circumstances of the transfers rebut the statutory presumption by the necessary weight of the evidence.

The facts are not in dispute; the only problem is the propriety of the inferences respectively urged to flow therefrom.

Decedent died February 4, 1971, leaving a will dated July 8, 1960, whereby, in the first instance, he left his entire estate to his wife, but if she predeceased (as was the case), then his estate was to be given 30 percent to his only son and 20 percent to be shared by his two grandchildren, outright, with the other 50 percent to be held in trust for the son and grandchildren. The gross probate estate was inventoried at $60,701.81 and appraised for inheritance tax purposes at that figure.

Decedent's wife, Edna Schanbacker, who had been a semi-invalid and intermittently of questionable mental competency for some years by reason of several "strokes," had predeceased him by a little over two months, having died on November 23, 1970. By her will, likewise prepared in 1960, she left her entire estate to the within decedent, outright. Her estate consisted of 214 shares of stock of Bucks County Bank and Trust Company valued at $13,696, a savings account of $2,834.07, and a life insurance policy on her own life payable to her husband in the amount of $2,000. Dece-

dent's treatment of these items of his wife's estate which he so received in his own right constitute the transfers herein sought to be taxed in his estate. No problem has been presented as to valuations or as to the propriety of the tax assessed in either the wife's estate or the within decedent's probate estate, which included no assets received by him by reason of his wife's death.

On December 3, 1970, the very day that he probated the will and qualified as executor of his wife's estate, decedent caused her bank shares to be transferred to his name, consistent with her will. Only a week later, he executed three assignments of respective numbers of these very same shares: 72 thereof to his son and the son's wife, 71 thereof to his granddaughter, and 71 thereof to his grandson and the grandson's wife. He left the respective certificates therefor in the care of his attorney until he picked them up and delivered them to the respective donees on Christmas Eve.

Decedent collected the $2,000 proceeds of the life insurance policy on his wife's life and used the same to purchase two $1,000 certificates for "full paid shares" in the Dublin Building and Loan Association, causing the same to be issued on January 19, 1971, in the respective names of his grandson and wife and of his granddaughter. He also closed out his wife's savings account by transferring the $2,834.07 balance on December 10, 1970, as an addition to the corpus of an inter vivos trust created by the wife in 1963 under which she and her husband were the respective income beneficiaries with remainders to their son and grandchildren.

At the time of his death, decedent was in his late seventies, but in apparent good health for his age. Some years earlier he had undergone a laryngectomy

and was known during his wife's illness to have had need for surgery for a hernia, but such operative procedures were not urgent and were deferred so that he might not be incapacitated even temporarily from taking personal care of his invalid wife. In September 1970, his physician had given him a thorough physical examination, including routine laboratory tests and an electrocardiographic examination. All results were negative. He had consulted his physician again on February 3, 1971, with symptoms of a common cold with some chest congestion. Chest X-rays were taken and disclosed nothing abnormal, and the doctor prescribed only a bronchial anti-spasmodic medication. He died, suddenly, the very next day of an acute myocardial infarction of which there had been no prior warning.

The auditing judge is convinced by the weight of the persuasive evidence that decedent had no knowledge or apprehension, and no reason or occasion for knowledge or apprehension, as of December 1970, and January 1971, of the imminence of his own death. Nor did his conduct and discussions with others during this period give any indication that he was even giving thought to this possibility in arranging for the transfers in question.

Section 222 of the Inheritance and Estate Tax Act of June 15, 1961, P.L. 373, 72 PS §2485-222, in taxing transfers in contemplation of death, creates a presumption of taxability where the transfer is gratuitous and of a material part of the transferor's estate and is made within two years prior to his death. The presumption is rebuttable, but a very heavy burden of persuasion rests upon those seeking to overcome this presumption. See, e.g., the discussion of this court on the subject in Heacock Estate, 43 D. & C. 2d 191, 195 (1967), 17 Bucks Co. L. Rep. 200, 203, 17 Fiduc. Rep.

599, where the considerations and criteria of section 222 were summarized, as follows:

"It is clear thereby that a transfer is taxable in this context when, and only when, the dominant, although not necessarily exclusive, motivation was the thought of death, a motivation which must have been at least the *sine qua non*, or the circumstance without which the transfer would not have been made, although it need not have been so pressing or urgent as to constitute the expectancy of imminent death necessary as a legal element of a gift *causa mortis*." (Italics supplied.)

The late and respected Judge Sheely expressed the same idea in somewhat different phraseology in Miller Estate, 8 Adams Co. L. J. 31, 37, 38 (1966):

"This [section 222] places upon the donee the burden of proving a negative; i.e., that the thought of death was not the impelling motive in making the transfer and that the transfer would have been made without that thought. Furthermore, the expectancy of death referred to is not restricted to a thought of death momentarily expected, but includes any thought of death which was a motivating factor in making the gift at that time. This is an extremely heavy and difficult burden of proof. . . .

". . . A careful consideration of the statute reveals that it was the intention of the legislature to make all gifts or transfers of a material portion of the transferor's estate within two years of the date of death subject to inheritance tax unless such transfers were made for some bona fide and demonstrated motive other than avoidance of tax."

Of crucial importance in judicially determining whether the statutory presumption has been overcome is the presence or absence of significant and adequately proven motivations demonstrating continued-

life purposes in effectuating the transfers. Compare, e.g., Heacock Estate, supra; Dugan Estate, 17 Bucks Co. L. Rep. 368 (1967); Kummer Estate, 19 Bucks Co. L. Rep. 147, 19 Fiduc. Rep. 503 (1969); and Hiller Estate, 50 D. & C. 2d 678 (1970), 20 Bucks Co. L. Rep. 443, 21 Fiduc. Rep. 124, where "life" motives were established and the presumption was held to have been overcome, with Steigerwalt Estate, 19 Bucks Co. L. Rep. 470, 20 Fiduc. Rep. 274 (1969), where no such "life" purpose was shown and the presumption was held to have prevailed even though decedent's imminent death was not anticipated at the time of the transfer.

In the instant case, although the transfers were gratuitous and were all part of one inter-related series of transactions and, together, clearly constituted transfer of a material part of what technically and legally then comprised the transferrer's estate, they, nevertheless, were, in fact, not made by him in contemplation of his own death but rather in the fulfillment of definitely established continued-life purposes on his part.

In the first place, the unquestionable theme or occasion for all of these transfers was decedent's thought and motivation that he was processing not his own personal assets but rather those of his deceased wife, pursuant to a scheme whereby he was merely the conduit or instrumentality through which *her*, not his, desires might actually be carried out. In this connection, it must be noted that although the shares of bank stock and cash which constituted the subjects of the transfers unquestionably had vested in him as a matter of legal ownership under his wife's will, he, nevertheless, regarded them not as his in fact but rather as his wife's separately identifiable estate which he desired to dispose of as such in accordance with what he under-

stood her plans to have been. None of the transfers included any of his own separately acquired assets, which included 248 shares of stock in the Bucks County Bank and Trust Company, as they might well have if he really had his own death in contemplation.

Secondly, for many years both decedent and his wife had been the real executive officers and administrators in the small town of Dublin of the only two financial institutions located therein, the Dublin National Bank and the Dublin Building and Loan Association. Even after the merger of the bank into the Bucks County Bank and Trust Company, they continued their interest and affiliation, decedent being an executive vice president in charge of the Dublin branch until his retirement, and he remained a director until his death. He always had been the executive secretary of the building and loan association and at the very time of his death was planning the relocation of its offices into another portion of his own home. In short, the bank and the association were their whole lives until Mrs. Schanbacker's failing health forced her into inactivity and semi-invalidism in the middle 1960's. They both were extremely proud of this relationship and of these financial institutions themselves. During lucid intervals, Mrs. Schanbacker on several occasions had expressed her desire that her interests therein should go to her child and grandchildren to carry on the Schanbacker family association therewith. Each time the subject came up, however, she lapsed back into mental disability before effecting the necessary legal documentation to carry out these expressed desires by either inter vivos transfer or change in her will. Under the evidence, it is clear that decedent concurred with his wife's concern that the Schanbacker name be perpetuated in association with these two financial institutions which had been so much a part of both

their lives, and that, in particular, in making the instant transfers of both the bank stock and the building and loan association shares formerly owned by or purchased with funds traceable to her, decedent was merely carrying out her expressed but unaccomplished desires on her behalf and in her place.

Thirdly, with respect to the bank stock at least, his timing of the actual delivery of the share certificates served the "life" purpose of having them constitute "one of the finest Christmas presents possible." Moreover, and probably even more important for present purposes, decedent was aware of the limited financial circumstances not only of his son but also and in particular of his grandchildren, one of whom had recently married and the other of whom was contemplating marriage. He had expressly desired them to have the wherewithal to be able to provide collateral security to secure their credit positions and borrowings as occasion might require and the furnishing of these transferred items was specifically mentioned as being related to his concern for their respective situations in this regard.

Under all of the circumstances of this case, the auditing judge believes, and formally finds as a factual conclusion, that decedent, in making all of the subject transfers, was motivated in no degree by regard for the possibility of his own death, but rather and to the contrary he made these gifts for continued life purposes and would have done so in any event regardless of whether he did or did not have his own death in mind and totally independent of that question. Accordingly, under the standards hereinabove outlined, the subject transfers were not taxable under section 222 as in contemplation of death.

The withdrawal of decedent's wife's savings account of $2,834.07 and transfer thereof as an addition

to the corpus of his wife's existing inter vivos trust of which he was the then income beneficiary, however, rendered that fund taxable, to the extent of such addition of $2,834.07, to the within decedent's estate under section 224 of the Inheritance and Estate Tax Act of June 15, 1961, P. L. 373, 72 PS §2485-224, as a transfer reserving a life interest in income to the transferor. This, accountant concedes. Further discussion, therefore, is unnecessary.

For the foregoing reasons, the auditing judge hereby sets aside and holds invalid and unjustified the inheritance tax appraisal in this decedent's estate insofar as it includes (1) lifetime transfers of 214 shares of stock of Bucks County Bank and Trust Company at aggregate values of $13,696.00, and (2) lifetime transfers of 10 full paid shares of Dublin Building and Loan Association at aggregate values of $2,000; on the other hand the auditing judge hereby confirms and approves the inclusion in said inheritance tax appraisal of the $2,834.07 in cash transferred to the inter vivos trust under deed dated February 13, 1963, and awards to the Commonwealth the tax and penalties properly computed thereon.

No other unpaid claims against the estate were presented.

No other questions for adjudication were stated in the petition for adjudication, nor were any apparent to the court from the record.

Subject to distributions in fact heretofore properly made, the net ascertained balances for distribution are hereby awarded as suggested by the schedule referred to by the last paragraph of the petition for adjudication pursuant to the will of the decedent, a copy thereof attached to the petition for adjudication being incorporated herein by reference.

No schedule of distribution need be filed.

The account is hereby confirmed, and it is ordered and decreed that Bucks County Bank and Trust Company, executor as aforesaid, shall make and pay the distributions herein awarded forthwith upon the absolute confirmation hereof.

And now, August 29, 1972, the within adjudication is directed to be filed and is hereby confirmed nisi.